Desjardin, maybe. Thank you. Thank you. And is it Chapdelaine? Am I pronouncing it close to correct or correct? Yes. Yes, you are, Your Honor. Okay. And you can hear us all okay? Yes, I can. And thank you very much. Okay. So you have, I guess you've reserved a minute for rebuttal. So you have four minutes to kind of focus us in on your biggest sort of issues here, and then we'll hear from the other side. Okay. May it please the Court, my name is Darlene Chapdelaine. I represent myself pro se appellant in this case. This case is not about a disputed scuffle or murky record. It's about a peaceful citizen, myself, who's recording in my own driveway, who asked for help, who asked for a name, and who was taken to the ground without a single warning, without a command, without a directive, all for just merely asking a name. That's a sworn statement of Trooper Doge, who witnessed the entire event, confirmed that I was given no instruction before Officer DeJarvin lunged at me and took me to the ground. This is not a credibility case. The facts are corroborated by video, sworn testimony, and certified internal discipline. The defense may argue that this matter should be of jury discretion, but Graham v. Conner and Barnes v. Felix, which was decided after my trial and was not available to the jury, but on appeal, this Court must apply the current controlling law. That standard supports this reversal. The jury was instructed on that standard, but their verdict ignored it. They focused on what happened after I was taken to the ground, not what led up to it, not how I greeted the police office with, thank you, I'm here, not the fact that the three of us were already separated and that when asked and when Trooper DeJarvin was there any violation of Connecticut law, he clearly stated and testified there was no violation of law. What happened was I asked DeJarvin for some help with a loose puppy that had gotten loose, a Pomeranian puppy that weighed less than 10 pounds. DeJarvin's response to me was shocking. He told me to catch my own effing dog, only he didn't use effing, he used the word. I asked for his name twice as a result of his vulgar response. He was disciplined through the internal affairs investigation, which was filed the very same day as the incident, and the investigation commenced the very same day. The IA report was never challenged for its trustworthiness, never challenged at all by opposing counsel, and that's part of my argument that the whole report should have been submitted and allowed to be seen because under Carol B. Trump, it should have been given preclusive effect because DeJarvin was disciplined. There was clearly fabricational reports. Reports were manipulated, changed only after they saw the video and only after they sat with the internal affairs officers. Did they correct their reports? I was arrested for interfering, and in the end, it turned out the hand that I was allegedly interfering with turned out to be DeJarvin's own hand lunging at me, his own gloved hand. It was in three reports he wrote that, that my hand came in close proximity to him, when in fact, it was his own hand that came at me, slapped my cell phone out, knowing I was disabled because that was already disclosed to him, knowing that I had just had major spinal surgery, took me to the ground, placed both knees on my lower back, which Trooper First Class Doge testified to, and it's within the internal affairs report. The defense may argue that the jury weighed credibility, but the record is not in dispute. The video, the internal affairs discipline, and Doge's statement are all aligned, and under Steuben Foods, I'm sorry, Your Honor, I can't pronounce the last part of that name. That's a 2025 case. Appellate courts may reverse and direct judgment when the jury's verdict lacks evidentiary support. That is precisely the case here. Now, in the malicious prosecution claim, the district court erred in dismissing this claim. I was never convicted. It was a 24-hour, just long enough for them to process the paperwork. After being held for five plus years under the restrictions of bond for something I never even did, and the video supports, I was never disorderly. I was not interfering. I was merely video recording the incident from a safe distance. Moreover, the trial court actually, Thompson v. Clark, supports the favorable termination under the 24-hour diversionary program, and... Okay. I think... I know it goes quickly. You have some time on rebuttal, so we're going to hear from your adversary now. Okay. Thank you, Your Honor. Thank you. Good morning. May it please this honorable court. I'm Assistant Attorney General Samantha Wong, and I represent defendants former Trooper Disjardin and Doge in this matter. This court should affirm the judgment below because the district court properly denied plaintiff's motion for judgment as a matter of law. Plaintiff's arguments in her brief, and here before your honors today, ignores all the evidence favorable to the defendants when the standard of review calls for the exact opposite. Here, the evidence must be construed like most favorable to the non-moving party, which was the defendants. There was ample evidence presented that support the jury verdict in this matter. This was a five-day jury trial that the jury was free to credit the, not only testimony, but the indisputable video evidence in this matter. Your honors, plaintiff goes into great detail that this wasn't a credibility case, that all the evidence shows that she, in fact, did not antagonize the officers used excessive force, and specifically, she references Barnes v. Felix. In Barnes v. Felix, the court held that in the totality of circumstances, there's no time limitation. And the precise time of the use of force, you can go beyond that and look at the earlier facts. Well, that is critical here. What the evidence showed was the reason for the call for the troopers to arrive on scene. Here, we had a 911 call of a crime of assault against an elderly person. We had prior knowledge that the plaintiff had recently had a prior arrest for threatening to shoot people approximately one month prior to this alleged incident in November of 2021. We also had a fluid scene when troopers arrived. When troopers arrived, this is an unsecured scene. We had a victim who displayed injuries consistent with recently being assaulted. We had plaintiff moving about her own property, weapons unknown to the troopers at the time. Plaintiff indicates that she was cordial, that she simply asked for the officer's help. But here, we had a fluid situation in which officers had to use real-time discretion in trying to separate the parties. Plaintiff alleges that she was... Before you run out of time, let me just ask you about the Thompson v. Clark issue. Yes, Your Honor. What's required for favorable determination? Did we have that here? Should we change our law? Your Honor, we should not. And first, I think it's imperative to note that by plaintiff's own admission, she brought the Melissa's prosecution claim under state law. In Connecticut, under state law, participation in a diversionary program is not favorable termination because it's, in essence, a conditioned dismissal. It's not a dismissal without explanation. Here, we have a full court transcript that was submitted to the underlying district court indicating why Ms. Chaptalin's case was dismissed. It was dismissed because of her participation in a supervised diversionary program. But Thompson seems to suggest that as long as there isn't a conviction, that that is a favorable termination. First, I would note that Thompson is confined to Melissa's prosecution's claims brought under 1983. It is defendant's position that plaintiff merely brought hers under state law. But if the court were to construe her claim under 1983, although it appears that Thompson does broaden the scope of when someone can bring a Melissa's prosecution claim, that's not boundless. Recently, the court in August did rule that Thompson... So this criminal case went on for five years. Correct. It's disturbing in itself. Is there any indication, anything in the record to suggest that the state troopers had any involvement after the initial arrest? No, Your Honor. In fact, there was testimony at the underlying trial that once the case was submitted to the prosecutor's office, they did not have involvement. Was there an indictment? I couldn't tell. Your Honor, it was... No, it was arrest warrant. Okay. Thank you. If Your Honors have no further questions, we would rest on our brief and ask that you affirm. Thank you. Thank you. Excuse me. Okay. Ms. Ciappellini, you've got a minute to respond. Okay, Your Honors. First, I would like to say that she addressed about the antagonistic behavior. In the internal affairs complaint, the investigation, it should have been admitted as an exception to the hearsay. It's certified. It was not challenged. It was trustworthy. It was done at the time. And he was disciplined for his antagonistic behavior prior to entering my driveway. In addition, he was disciplined for deactivating his MDR recording device 500 feet in front of my driveway and then keeping it deactivated until in less than three minutes, I was taken out. And then he activated it when I was in the car with several severe spinal damage. I asked to go to the hospital. I asked for help, for which he refused. Then he activated his camera again. All of that, the jury should have been able to see. And it was allowed because it was more probative than prejudiced. There was no fluid scene, as she described. And the officers, that is an outright fabrication of the evidence. And I'm sorry, Your Honors, I don't mean to disparage my opposing counsel. However, there was no fluid scene. The video is very clear. I was well over 25, 30 feet away from Bruce, who still currently resides with me and I care for. I was well away from his granddaughter, who was in the pickup truck. I was probably 50 feet away from her. They had both the driveways locked. And under testimony, both Dojay and Desjardins said there was no violation of Connecticut law when they entered my driveway. None. We were already separated. There was no fluid going on. Their first two questions that were asked the alleged victim, and it's sworn testimony and it's in the internal affairs, was what happened? Did you fall? Twice he responded to the officer that he fell. What happened here is they had to fabricate charges because they knew he fell. They knew I was injured. Now, in less than three minutes, they were on my property and I was down the road. Why? Because what this court is aware of through my brief, is that I had previously filed a complaint against Trooper First Class Desjardins. And that's in the record for what he did to another female, leaving her with severe injuries. And she was afraid to file a complaint. I filed it in April with Commissioner Dora Shiro. That's all part of the record. And this was clearly meditated and clearly retaliation. He took out a civil order of protection and he had a drone on his property. He said he's an officer and he threw the drone away. Yet he accused it of BMI. I think we understand your position. Thank you very much for explaining. Thank you, Your Honor. And thank you to both of you for your arguments today. We will also take this case under advisement. And with